Good morning, Your Honor. It's my aspiration to save three minutes. May it please the Court, I'm Eric Weaver on behalf of Jovan'z Smith. I think it's significant that the appellee in this case has never defended the reasoning of the California Court of Appeal. Instead, what they try to do, understandably, is to hide behind the reasonableness determination. But there is no of the unreasonable determination of the facts. Well, let me just ask you this. Since, if we put it under ADPA review, which that that's obviously what you're saying that the appellee is relying on, and you're trying to get de novo review, correct? No, what I'm saying is that the it's a it's a split issue. First, the facts have to be determined based on the objective record. Then, what is the de novo? It's de novo review with deference to the decision of the Court, the California Court of Appeal. So, that's . . . How do you get that under ADPA? Under ADPA? Yeah, how do we have de novo review with deference to the facts? Don't we owe under ADPA, unless there's an factual determination of the Court of Appeals, the state, right? Okay, so the deference that applies is in a situation in which the Court of Appeal, excuse me, the California courts made credibility determinations. But, if there are objective facts that don't rely on a credibility determination, then the appellant has the burden of showing that the determination was unreasonable by clear and convincing evidence. That's Wiggins versus . . . Unfortunately, I've written concurrences where I've strongly disagreed with the state courts of appeal about the custody issue, which is the one we're talking about here. But, the reality is, if there are facts in the record that would permit fair-minded jurors to reach the conclusion they did, aren't you stuck? Aren't I stuck with their determination about custody? Well, but that's that's the issue. Is there . . . Are there facts that would support the determination? They . . . The Court of Appeal repeated that there was three . . . He was told he was free to go three times. There were only two, but does that change the ultimate determination that there were two references that we can go through the whole list of things that they relied upon? But, the reality is, isn't it the indisputable fact that fair-minded jurors can disagree about whether your client was in custody? I don't think that a fair-minded juror could agree that he was . . . Oh, no, fair-minded jurors could disagree about that.  So, these Court of Appeals justices, by definition, are not fair-minded. Is that right? Because they reached the contrary conclusion. The fair-minded is not . . . The fair-minded standard is not a subjective evaluation of the fairness of the judge. It's a highly deferential, objective standard. So, we're not here to criticize the judges. We're here to say, was it objectively reasonable for them to conclude that he was told he could leave three times and he was told that he was not under arrest three times? He was told he could leave once under circumstances where they're closing the door, forcing him to move to the back of the room and to have a table between himself and the door. That's the one time he was told he was free to leave. One of the times he was told he was not under arrest was when he was still at the school. The other time he was told he was not under arrest, he was told that he was not under arrest in the context of being told that the officer himself didn't know if he could leave or not. Well, but then after that, after that happened, I also noticed the officer that did the poly or the voice determination on him, he said to him after, he clarified what he had said, and he said, no, you're not under arrest, all that. But after, I noticed at the end of that, he shook his hand and said, hey, I hope it all works out for you, man. Here's my card, call me if you have any questions later. I mean, if a guy's going into jail, why are you giving him your card? And then the doors left open. I think all of us listened to the very lengthy interrogation. Right, right. And, and then after the doors opened, because I can hear police officers out there talking, no one's sitting in there with them, the doors open, and they're out there talking about a bunch of other stuff as far as that goes. So I think that's got to add into the calculus. I think at its root, the problem with the Court of Appeals opinion is, is that it assumed that the assurances were the sine qua non of the decision. They are factors, weighty factors. In the totality of the circumstances. In the totality of the circumstances test. They assumed that the assurances were twice as strong as they actually were. They discounted any evidence of coerciveness of which we've listed numerous factors of coercion, including the highly unusual fact that they left him alone with the grandmother of the baby and let her, exposed her to him, to her weeping for 20 minutes and wanting to know what happened. So the question, the, the, the ultimate question in this case is. But how does that prove he was in custody if they leave her alone with the grandmother? The part of the determination of whether he's in custody is the extent to which he is confronted with evidence of guilt and with accusations that he's known to be guilty. The amount of pressure that's placed on him. The pressure here that he was guilty was relentless. From the very beginning to the end, it was relentless that he was guilty. When the police are telling you over and over again you're guilty, that you're not leaving here lying, that you're, that we know what you did, that we're going to figure this out, that you're going to be charged by an adult. That is part of the, whether a reasonable person would feel free to go or not. But there's another way to look, I guess that's the whole thing about what Judge Smith was saying. If that were the only way to look at it, then that's what, but could a fair minor jurist look at it the other way? And when he's talking about, you know, saying, you know, hey, I, you know, if this, if this is an accident, it's better for you to say that now because people would, you know, people get mad at their kids. You know, there's a kind of a, you know, why isn't that just good interrogation to say, well, hey, I have kids. I know they're really annoying and people get upset with their kids. If it's an accident, it's a totally different thing. So if it's an accident, you're, you know, as opposed to if you did something intentional and then you could be charged as an adult and this is, could be what happened. You could look at that not just as a threat, this is what's going to happen to you. It's just, hey, man, this is the reality of how things play out. And if you had an accident with a kid, I could relate to it, but it would be, you know, it's a good thing to tell us. Well, those are two of the classic tactics of coercive interrogations that were identified by Miranda. One is to minimize the moral responsibility of the suspect. And two is to contrast, is to imply that talking will help them out in their situation. As we identified in our brief, that's part of the classic interrogation tactics that the police use all cases. Those, in fact, those are precisely to raise the level of coercion because they have to throw a fictitious lifeline to the defendant. You're at a minute and a half. I'll give you two minutes for a rebuttal. Okay, great. Thank you. So that you can hear what the other side has to say. Thank you. Thank you. I appreciate that. Good morning. Good morning. May it please the court, Karen Bovarnik for the people. The issue, as the state, whether the state court reasonably concluded the appellant was not in custody for purposes of Miranda. The state court's determination is entitled to deference, and that's a very broad standard. And there is a way to get into de novo review, though, if you feel that, you know, that no reasonable-minded jurist could have come to the conclusion. And we actually look at the same, I mean, I guess admittedly what you would say is we would have to say that three justices were out of their mind to come to that particular conclusion. But by the same token, it's not unheard of in Ninth Circuit jurisprudence or anyone's jurisprudence. When you look at the same thing, you say, it couldn't be anything but because he was there for quite a few, probably six hours before he was finally put under arrest. It goes on for a long time. You know, people are coming in and out. There are breaks to find the poly guy. They do a poly and, you know, and you could tell someone you're not under arrest, you're not under arrest. But isn't that sort of a legal fiction? I mean, who in their right mind would get up and walk out of the police department? Well, if you look at the video in this case, as it sounds like the Court has done, if you look at the video, which, by the way, is different than the transcript, it really confirms the reasonableness of the trial, of the state court's decision. The video was lodged with the DCA, correct? The thing, I'm sorry? The video was lodged. I mean, they were lodged with, and they mention it in the three-judge panel decision, so we can assume that they looked at that. Correct. And the state court based its decision, the state court also based its decision on the video, not the transcript. The transcript was abridged, and then the jury ultimately saw the whole thing because the defendant testified. But there are significant differences, that's all I'm saying, because, as you know, the door's not always closed. Often it's open. There's like a 20-minute section after the lie detector test is given, I believe, where a bird flies into the courtroom. You can hear that going on. People are coming in and out. The grandmother, by the way, you can see, she's there alone with the defendant at a certain point. And she also talks, just to address another point, she also talks about that they're questioning her. And I believe in the trial transcript as well. I'm kind of mad because she says I should be at the hospital, and here I am having to make decisions, and at some point she blames herself for the death, right? Correct. And she's being questioned. That was actually my point. She's being questioned just like he is. It's an accident. They're both being questioned. And she keeps saying, what am I doing here? I should be back at the hospital. Even worse, she turns to him and says, why did you leave that hospital? How come you left? He also talks about how he wants to get to his basketball game. He's staying there because he's agreed to take the lie detector test. And again, if you watch the video, he gives his version. Officer Detective Mustard says, you willing to take a lie detector test? He says, yeah. Asks him again. He says, yeah, I'm willing. I'm willing. And then he keeps, there's a big portion of the video where he's by himself. He's practicing yes, no, yes, no. He's calming himself down. And then in the transcript, it's all like as if it's all said together. But it's actually different. Different things are said over a period of time. And then he's talking to himself and he's saying, waiting for this, waiting for this lie detector test, I got to get to the basketball game. So he thinks he's going to leave because a reasonable person in that circumstance would be leaving. But for the fact he's agreed to take this lie detector test. What about the exchange with Detective Pucci, though, where he asks, can I go after this test is over? And he doesn't receive an unequivocal response by any means. Well, he's told you're not under arrest, as Judge Callahan pointed out. He's told you're not under arrest and he clarifies that later. But what he wants to know is, can I leave? And he's not told, of course. He's told, actually, I don't know because you're not done with your questions with Detective Mustard, are you? But if you look at the whole context, what he's really told, essentially what he's asking is, am I done with the lie detector test, which I've agreed to take? He says, will, it's not essentially, I'm just looking at what the transcript, at least, not the transcript, but rather what the magistrate judge's report quotes. He says, likely, it says after this is the prelude, right? Will I be able to go home? That's his question. Now, the answer, if he truly were free to leave, would have been, of course, right? That's not what he's told. He's told by Detective Pucci, I don't know. And if Detective Pucci doesn't know if the defendant can go home, and he suggests the reason I don't know is because you're not going to be able to leave here until Detective Mustard is finished with his questions for you, and he doesn't know, Detective Pucci doesn't know if that question is over. So if Detective Pucci doesn't know, how could the defendant know that he was just free to walk out of there at any point that he wanted to? Because he's also told you're not under arrest, and in Howes v. Fields, U.S. Supreme Court precedent, that's, you're being told you're not under arrest. It's reasonable for the State Court in that situation to infer that that, under Howes v. Fields, that where in that case, the defendant was actually already in custody, that he's not in custody. Okay, so let's say that Detective Pucci says you're not under arrest, and so the defendant asks again, okay, so can I go home now? And Detective Pucci says, no, we're not done questioning you. On that record, you're saying that the State Court of Appeal can reasonably say, oh, but he was told he wasn't under arrest, so that's the policy? That's a, you made a little change that's different from our case, which is, he says, can I go home now? And Detective Pucci says, no. And that's, that's a significant difference from our case here. I intentionally changed the question because of your response. I'm saying, you're, you put all the weight on the fact that he was told, am I talking too close? Is that why you're? It's, yeah, it's a little echoey, I'm sorry. I know, I'll try to sit back. You're putting all the weight on the fact that he was told you're not under arrest, and you're saying that when a person is told you're not under arrest, the State Court of Appeal can reasonably say, well, that means that they must have known they were free to go. With due respect, I'm not putting all the weight on that statement alone. I'm putting it on the totality of the circumstances surrounding that, which is that he's agreed to take a lie detector test. That's what he's waiting for. He's anxious to go, but he wants to take that lie detector test, and he wants to, to essentially prove that, you know, his version of events at that point is correct. Let's say that he's told, let's just say that he's told, you are free to go, but not until we're done questioning you. Okay? Is that, is that person now in custody or no? Um, the, the, uh. They are, right? They are. Yeah, that's, that's a totally different situation. And that's what he's told. That is what he's told. He's told, we're not done, Detective Mustard is not done questioning you, and you're not going to be allowed to leave until that happens. And, and yes, he's told, in addition, you're not under arrest, but I'm saying, when you put those two things together, I'm not sure a state court can reasonably say that person objectively must have felt that they were free to walk out of there. Uh, if you look at, I'm sorry, I was looking for the surrounding circumstances. He's told you're not under arrest. He comes back and clarifies. And the, if, in the totality, what he's asking is, can I come home now, can I go home now? Am I through with this portion that I've agreed to stay for? I think that's a different situation. I think reasonable minds could differ, and we have to defer to the state court, the trial court, and the state court of appeals judgment, that in the totality, um, he was not in custody in that situation. Do you put any weight on the fact that, at two different times, uh, the defendant consents to things that he doesn't have to consent to? There's signed forms in terms of, he consents to a search of his place, and then later he consents to the, the voice stress, or poly, or whatever we're going to, or, you know, lie detector. Um, he doesn't have to consent to those, but he does. Does that have any weight in the whole part of it, as to what his subjective state of mind was? I think, if you watch the video, actually, it's interesting. When he signs the consent to the, um, the stress test, the lie detector test, the voice test, he takes a long time to review that form. He takes a long, he's in charge. He's deciding at that point. And he decides he's still sticking with it, and he's going to consent. He's in charge. Is that form in the record? Pardon? Is that form in the record? I see it there, but I know what those forms, a lot of times, say you don't have to consent, it's up to you, or whatever, and is that form in the record? I'm not, I'm not sure. I'm not sure. I'm not that familiar with that part of the record. Okay. You need to wrap up. Your time's almost up. Um, the other thing I want to just hit very clearly is that, uh, assuming there were error, um, which we don't think there is, I want to also talk about how there's no, uh, no prejudice under Brecht. Um, basically, we had an expert, the rebuttal, if you look at the experts, the, uh, this case did not depend solely on this confession. It didn't even put everything over the top. He was the last one with the, with the child. And then you have an expert who basically, the most compelling thing the expert says, the expert for the prosecution, is that the defendant's whole case depends on a swallow reflex. There is no such thing. There's a gag reflex. And that, the jury was presented with all this. There was no way that this scenario, his defense, really made any sense. All right. Thank you. Thank you very much. Just have a few, uh, quick points. First, the Court of Appeals opinion says, puts all the weight on three times told to go, three, three times told he could go, three times told he's not under arrest. And that's not true. That automatically calls into question the reasonableness of their analysis. If they had wrecked, uh, perused the record with the care that the district court did, they would have realized that's not true. That makes that factual finding unreasonable. Again, I want to emphasize, I know, uh, Judge Callahan, you were speaking for emphasis. We're not talking about the Court of Appeal being out of their mind. We're talking about a highly deferential but objective standard. So we're not personalizing it to these judges. We're just asking whether the decision is reasonable or not. Another factor that we haven't talked about is, he was there for six hours. There's no case out there that, uh, how, finds that someone's free to go if they're detained for six hours. I beg your pardon? I'm sorry? That's simply not true. There are a number of cases. For six hours? I, I, I, I, I'll tell you, I get the number, I get the case to you, but there was a case I had about a year and a half ago, that's one where I wrote a concurrence saying if I'd been one of the state, uh, Court of Appeal justices, I would have ruled otherwise. A woman was picked up, uh, at a farm, uh, almost an hour out of Fresno, uh, put in the back of a police car, a locked police car, while they searched her home, took her to the police department, people were standing around, she was permitted to go to the bathroom, was never told she was free to go, uh, and ultimately, about nine hours later, was arrested, and it was upheld under AEDPA. That's just one case, there are more. Well So you can like AEDPA or not like AEDPA, I don't particularly like it, but it is the our court, which sometimes takes an expansive view of what it really means. I understand, Your Honor. Um, in Bassani, I apologize for not, uh, finding that case that you wrote the, in, but in Bassani, I'm not, it says that 3.5 hours is the upper limit of what we countenance for, um, a, uh, non-custodial situation. That's what I was basing my, uh, my statement on, so I apologize. Um, I used up my time, so thank you. All right. Unless, did, no, the panel does not have any further questions. Thank you both for your argument in this matter. It will stand submitted.
judges: Callahan, Smith, Watford